**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

---

JOHN DOE,

                **Plaintiff,**

     **v.**

UNIVERSITY OF ST. AUGUSTINE FOR
HEALTH SCIENCES, LLC,

                **Defendant.**

Civil Action No.: **'25CV2631 H    DDL**

**COMPLAINT**

**Jury Trial Demanded**

---

PLAINTIFF JOHN DOE, by his attorneys Offit Kurman, P.A., as and for his Complaint against Defendant UNIVERSITY OF ST. AUGUSTINE FOR HEALTH SCIENCES, LLC ("USA" or "Defendant"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1. This Title IX discrimination lawsuit is brought on behalf of Plaintiff John Doe ("John" or "Plaintiff"), a former student at USA.

2. During his enrollment at USA, John was subjected to repeated instances of peer-on-peer sexual harassment due to his status as a male.

3. This peer-on-peer sexual harassment was so severe, pervasive, and objectively offensive that it deprived John of access to the educational opportunities and benefits provided by USA.

4. Specifically, the constant peer-on-peer harassment caused John to seek a lesser degree, negatively impacted his grades, and led him to take a leave of absence from his academic program.

5.      John reported the continuous harassment to USA on multiple occasions.

6.      In violation of Title IX of the Education Amendments of 1972, USA engaged in deliberate indifference by permitting the peer-on-peer harassment to continue after John made multiple reports of the harassment directly to USA.

7.      USA's failure to act also made John vulnerable to further harassment and discrimination.

8.      John was also subjected to sexual harassment by an instructor at a clinical placement site chosen by USA.

9.      The harassment at the clinical placement site was so severe, pervasive, and objectively offensive that it deprived John of access to the educational opportunities and benefits provided by USA.

10.     Specifically, the harassment at the clinical placement site resulted in John being forced to perform demeaning tasks that were outside the scope of his academic program, caused John to receive a subpar clinical education, and culminated in John's dismissal from the program as a result of his termination from the clinical rotation and accompanying failing grade, both of which were based on false statements made by the instructor, including a final evaluation replete with untruths regarding supposed interpersonal disputes and patient complaints, motivated by the instructor's anti-male bias against John.

11.     John did not initially report the instructor's harassment to USA because of USA's prior deliberate indifference to his reports of peer-on-peer harassment.

12.     However, John eventually reported the instructor's harassment to USA on multiple occasions.

13.     In violation of Title IX of the Education Amendments of 1972, USA engaged in deliberate indifference by failing to take any steps to correct the harassment that John was subjected to by the instructor or to remedy the effects of that harassment after John made multiple reports of the harassment directly to USA.

14.     USA's failure to act also made John vulnerable to further harassment and discrimination.

15.     USA ignored John's repeated attempts to bring the instructor's harassing behavior to the school's attention and instead engaged in rubber stamped denials of John's appeals of his improper and discriminatory dismissal.

16.     After his final appeal was denied, John learned that a female student at USA was terminated from her clinical rotation after she dropped a patient.

17.     This resulted in a failing grade, which should have in turn led to her dismissal from USA.

18.     However, the same USA administrator who awarded John an "F' grade in his clinical rotation and advocated for John's dismissal despite knowing that John had been subjected to persistent, severe, and objectively offensive harassment, awarded the female student a passing grade without requiring the female student to go through the required appeal process.

19.     Thus, it is clear that in the course of adjudicating John's appeals of his dismissal, USA's deliberate indifference to the harassment he suffered subjected John to a form of sex discrimination other than sexual harassment or sexual assault.

20.     John has been damaged by USA's actions, as his future educational endeavors and career in healthcare have been severely compromised.

## THE PARTIES

21.     John Doe is a natural person.

22.     USA is a California Limited Liability Company that operates the for-profit University of St. Augustine for Health Sciences in San Marcos, California.

## JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § because the claim herein arises under federal law.

24.     This Court has personal jurisdiction over USA because USA is a resident of the State of California and conducts business within the State of California.

25.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A. John Experiences Student-on-Student Sexual Harassment at USA**

26.     John enrolled in the Occupational Therapy Program at USA in July 2020.

27.     Due to the COVID-19 pandemic, USA offered virtual coursework for the first two trimesters of the 2020-2021 school year other than limited in-person lab time that was required for USA to maintain its accreditation.

28.     During the third trimester of the 2020-2021 school year, John was finally able to attend full time, in-person classes at USA.

29.     Women outnumber men by a ratio of approximately 16.5 to 1 in the USA Occupational Therapy Program.

30.     Once in-person classes resumed, John was immediately subjected to severe, pervasive, and objectively offensive student-on-student harassment due to the fact that he was a man.

31.     Once in-person instruction resumed, John was assigned to a cohort where he was the only male student.

32.     The other students in the cohort – all of whom were female – arranged their desks in a manner that purposefully excluded John.

33.     The female students in John's cohort also repeatedly referred to John as "trash" and told him that he had nothing to offer the occupational therapy profession due to his status as a "Straight-White-Cis-Male."

34.     They also told John that his presence in the Occupational Therapy Program was disrupting their "Safe Space."

35.     This behavior was observed by John's professors, who failed to take any action.

36.     John's female classmates were keenly aware of what they were doing and found it humorous that USA turned a blind eye to their harassment.

37.     John was subjected to this anti-male harassment during each and every in-person class that he took at USA from the third trimester of the 2020-2021 school year until December 17, 2021.

   **B.   John's Reports Multiple Instances of Harassment, USA's Deliberate Indifference, and the Fallout that Ultimately Forced John to Take a Leave of Absence from the Occupational Therapy Program**

38.     John immediately reported the instances of peer harassment to Erin McIntyre, his advisor in the Occupational Therapy Program.

39.     John had weekly meetings with McIntyre once in-person instruction resumed.

40.     During his weekly meetings with McIntyre, John continued to report that he was being subjected to harassment based on his sex.

41.     McIntyre had the authority to address John's reports of harassment and implement corrective measures.

42.     In order to alleviate the harassment, John asked McIntyre if he could complete independent coursework to meet the requirements of the Occupational Therapy Program.

43.     John also asked McIntyre if he could be placed in different classes to avoid the onslaught of harassment that he was forced to deal with from his cohort on a daily basis.

44.     Despite having actual knowledge that John was being harassed by the women in his classes and the ability to resolve the issue, McIntyre did not take any action to remedy the harassment and rejected John's proposals for implementing corrective measures that would avoid him being subjected to harassment in the future.

45.     Instead, McIntyre was more concerned with avoiding conflict within the Program and chose to intentionally ignore John's concerns and requests for help alleviating the harassment.

46.     Rather than intervening to protect John from continued harassment, McIntyre merely observed the abuse and treated the situation as an ongoing social experiment.

47.     McIntyre even asked John why he hadn't expected to experience anti-male harassment as part of USA's Occupational Therapy Program, as occupational therapy is a female-dominated profession.

48.     McIntyre's inaction subjected John to further acts of harassment, which, as noted above, occurred in all of his in-person classes, including after he made his reports to McIntyre.

49.     John also reported the repeated instances of anti-male harassment to at least three of his professors.

50.     John's professors had the authority to address John's reports of harassment and implement corrective measures.

51.     However, the professors did not take any action to halt or remedy the offending conduct that John reported to them.

52.     In fact, like McIntyre, John's professors also refused to provide academic accommodations proposed by John that would alleviate the harassment, as they were more concerned with how the women in John's classes would feel if he were given accommodations that would stop the continuous barrage of harassment.

53.     The lack of action by McIntyre and John's professors led to additional instances of harassment and otherwise left John vulnerable to harassment.

54.     Indeed, as noted above, the harassment by the female members of John's cohort continued to occur after John made his reports to McIntyre and his professors.

55.     As a result of this known harassment, John was unable to access educational opportunities or benefits offered by USA.

56.     John was purposefully excluded from participating in the group projects that made up the majority of the coursework in the Occupational Therapy Program.

57.     McIntyre and John's professors were aware that the female students in John's cohort were intentionally preventing him from partaking in group assignments, as John had informed them of this discriminatory harassment, yet they did not take any action to address the harassment or institute corrective measures.

58.     Indeed, as noted above, McIntyre and John's professors denied his requests to complete independent assignments or switch cohorts so that he could fully access the educational opportunities and benefits offered by USA.

59.     John's ability to meet the academic requirements of the Program suffered as a result of this unabated and known harassment.

60.     John had planned on obtaining a Doctor of Occupational Therapy degree.

61.     However, his grades and ability to keep up with the demands of the doctorate program suffered as a result of the harassment he was subjected to.

62.     This led him to abandon his quest to obtain a Doctor of Occupational degree and seek a Master's of Occupational Therapy degree instead.

63.     In fact, John was ultimately forced to take a leave of absence from the Occupational Therapy Program starting on December 17, 2021 as a result of the known yet unaddressed peer harassment.

**C. John Returns to USA and Experiences Further Harassment from a Clinical Fieldwork Educator that Leads to His Dismissal from the Occupational Therapy Program**

64.     John returned from his leave of absence on January 9, 2023.

65.     Despite actual knowledge that John had previously been subjected to severe, pervasive, and objectively offensive anti-male sexual harassment by his classmates, USA took no measures to remedy this past harassment or prevent further harassment upon John's return to the Program.

66.     Unfortunately, upon his return, John was once again subjected to further anti-male sexual harassment.

67. The Occupational Therapy Program has a didactic classroom portion and a clinical placement portion.

68. At the time of his return from his leave of absence, John had already completed the classroom portion of the Program, albeit on an extended timeframe and with lower grades that he should have earned due to the unaddressed peer-on-peer harassment noted above.

69. In order to graduate, John still needed to complete the clinical placement aspect of the Program.

70. After returning from his leave of absence, John successfully completed his first clinical placement at a site in Modesto, California.

71. As a result, he only needed to complete his final clinical placement to obtain his degree.

72. In March 2023, Jaynee Taguchi Meyer, USA's Academic Fieldwork Coordinator, abruptly changed John's final clinical placement over John's objection from a site in Phoenix, Arizona to a facility in Cedar City, Utah.

73. Jennifer Courtad (a.k.a. Jennifer Timmons) was John's clinical fieldwork educator at his clinical cite placement in Cedar City, Utah.

74. Throughout the clinical placement, Courtad consistently made demeaning and belittling statements to John because, as Courtad told John, he reminded her of her ex-husband.

75. Courtad also repeatedly made derogatory statements to John because he reminded her of male children that she had fostered.

76. Courtad's harassing behavior also included repeatedly giving John less than desirable and humiliating work assignments, including putting him in extremely uncomfortable

situations that he had explicitly asked not to be put in.

77.    As noted above, Courtad took these actions against John because he reminded her of other men/boys with whom she had bad experiences.

78.    Courtad's behavior further resulted in her refusal to provide John with proper clinical instruction and a lack of feedback on the tasks he performed, as she repeatedly made unkind comparisons between John and her ex-husband/foster children when she should have been providing the required guidance.

79.    Thus, as a result of Courtad's harassment John was unable to access educational opportunities or benefits offered by USA's clinical rotation program.

80.    John's clinical rotation in Utah was scheduled for twelve weeks.

81.    On July 20, 2023, during the eleventh week of the rotation, Courtad contacted Meyer *via* telephone and provided false information regarding John's behavior at the rotation.

82.    At the end of the telephone call, Meyer told Courtad that there were two options: John's rotation could be terminated that day or any time before the last day of the rotation; or John could be permitted to continue working through the end of week 12 of the rotation at which point he would be informed that he failed.

83.    This was consistent with the affiliation agreement between the Utah facility and USA.

84.    Specifically, the affiliation agreement states that USA will determine the course of action if a facility deems a student is unacceptable.

85.    The affiliation agreement bars a facility from unilaterally removing a USA student from a rotation.

86.     The affiliation agreement specifically notes that a facility must consult with USA before terminating a rotation or excluding any USA student from its premises.

87.     Later in the evening on July 20, 2023, Courtad sent an email to Meyer making additional false claims about John's behavior during the clinical rotation.

88.     On July 21, 2023, John's clinical rotation was terminated following these verbal and written consultations between Courtad and Meyer.

89.     John submitted a written report of Courtad's harassing behavior to USA on July 31, 2023.

90.     Erin Schwier, USA's Occupational Therapy Program Director, and Meyer received a copy of John's July 31, 2023 report recounting Courtad's harassment.

91.     Due to USA's failure to respond to and remedy the peer-on-peer harassment during the didactic portion of the Program, John refrained from reporting the harassment Courtad was subjecting him to during his clinical placement until the placement was over.

92.     Had USA properly addressed John's prior reports of peer-on-peer harassment, he would have been able to avoid further harassment by Courtad by reporting it when it occurred.

93.     Schwier and Meyer, as Program Director and Academic Fieldwork Coordinator, respectively, had the authority to address John's report of harassment and implement corrective measures.

94.     However, neither Schwier nor Meyer (nor anyone else at USA) took any action in response to John's report of Courtad's harassment or instituted corrective measures.

95.     Instead, USA exacerbated the harassment that John suffered in his clinical rotation and made him vulnerable to further harassment.

96.     Specifically, on August 2, 2023, Schwier received and accepted as true a final evaluation from Courtad regarding John's clinical placement that was rife with additional false allegations about John.

97.     Rather than taking steps to protect John from and implement corrective measures to address the known instances of harassment by Courtad that John had reported on July 31, 2023, Schwier awarded John an "F" grade for this final clinical rotation based on the false information provided by Courtad.

98.     During a meeting with Schwier and Meyer on August 3, 2023, John explained that he did not seek assistance related to Courtad's harassment prior to his July 31, 2023 written report because he believed that no one at USA would help him.

99.     This belief was based on USA's previous failure to remedy the peer-on-peer harassment that John had been subjected to during the didactic portion of the Program.

100.     Neither Schwier nor Meyer (nor anyone else at USA) took any action to address Courtad's harassment or institute corrective measures following the August 3, 2023 meeting.

101.     Instead, Schwier awarded John an "F" grade for this final clinical rotation based on the false information provided by Courtad.

102.     On August 9, 2023, USA informed John that he was being dismissed from the Program due to the failing grade awarded by Schwier.

**D.  John Once Again Reports Harassment but is Ignored by USA**

103.     John appealed his dismissal through the process mandated by USA's Handbook.

104.     In his first appeal submitted to the Academic Appeals Committee on August 31, 2023, John once again made USA aware of the anti-male sexual harassment that he suffered

throughout both the didactic and the clinical portions of the Occupational Therapy Program.

105.    Specifically, John informed USA that during the didactic phase of the Program he was repeatedly called "trash" by my classmates and was not allowed to participate in the group work because he was a "straight-white-cis-male."

106.    John also informed USA that none of his professors who observed the behavior of his classmates did anything to remedy the harassment.

107.    John further noted that when he advised McIntyre of the harassment from his peers, she did not take any action and instead told him that there might be something he could learn from the harassment.

108.    As part of his first appeal, John also detailed Courtad's sexual harassment.

109.    John noted that Courtad had subjected him to repeated instances of adverse treatment based on his sex because John reminded her of her ex-husband and children that she had fostered, including verbal abuse, ignoring questions that John had related to patient care, and requiring John to perform demeaning tasks that were outside the scope of his clinical education.

110.    John also explained that Courtad's final clinical performance evaluation was full of false statements based on her dislike of John because John reminded her of her ex-husband and children that she had fostered.

111.    John also detailed the deprivation of access to educational opportunities that flowed from Courtad's harassment.

112.    The Academic Appeals Committee had the authority to address John's reports of harassment and implement corrective measures.

113.    The Academic Appeals Committee refused to address the harassment that John

identified or to take corrective measures to rectify the damage caused by the harassment.

114.    Instead, the Academic Appeals Committee denied John's appeal and affirmed his dismissal from the Program on September 9, 2023.

115.    John submitted his second appeal to Tia Hughes, Associate Dean of USA's College of Rehabilitative Sciences for Occupational Therapy, on September 11, 2023.

116.    In his second appeal, John told Hughes that he was excluded from class discussions and group work by his female classmates.

117.    John also informed Hughes that his female classmates called him "trash" on several occasions during class.

118.    He further explained that he frequently asked his professors for assistance in dealing with the harassment, but they refused to intervene.

119.    John also noted that his professors repeatedly refused his requests for alternative academic accommodations that would allow him to avoid the harassment attendant in the group format that dominated his classes.

120.    John also informed Hughes that he repeatedly asked McIntyre to help him in resolving the harassment from his female classmates.

121.    John noted that, in response to his reports of harassment by his female classmates, McIntyre asked him why he did not expect such treatment, as occupational therapy is a female-dominated profession.

122.    John further reported that McIntyre acknowledged that he was being singled out and segregated based on his sex but that nothing was done to alleviate the situation.

123.    John's second appeal also noted the harassment he suffered from Courtad and

explained that he did not reach out to discuss Courtad's harassment due to how his prior complaints of peer-on-peer harassment were handled by USA.

124.    In fact, John noted that he feared the situation at his clinical placement (*i.e.*, the harassment by Courtad) would get worse if he reached out to USA for assistance due to USA's failure to properly address and remedy his prior reports of peer-on-peer harassment.

125.    As Associate Dean of USA's College of Rehabilitative Sciences for Occupational Therapy, Hughes had the authority to address John's reports of harassment and implement corrective measures.

126.    Hughes refused to address the harassment that John identified or to take corrective measures to rectify the damage caused by the harassment.

127.    Instead, Hughes denied John's appeal and affirmed his dismissal from the Program on September 18, 2023.

128.    John then submitted his third and final appeal to Brian Goldstein, USA's President and Chief Academic Officer, on September 27, 2023.

129.    This final appeal noted the first two appeal letters submitted, incorporated them by reference, and requested that Goldstein consider them in making his decision.

130.    Thus, the final appeal, in addition to the issues raised therein, reiterated John's reports of harassment that had, to that point, been ignored.

131.    As USA's President and Chief Academic Officer, Goldstein had the authority to address John's reports of harassment and implement corrective measures.

132.    Goldstein refused to address the harassment that John identified or to take corrective measures to rectify the damage caused by the harassment.

133.    Instead, Goldstein denied John's appeal and upheld John's dismissal in a final decision dated October 4, 2023.

134.    USA's initial failure to address the peer-on-peer harassment reported by John led directly to this outcome.

135.    If USA had taken the appropriate corrective measures after learning about the severe, pervasive, and objectively offensive peer-on-peer harassment that John was subjected to in the didactic component of the Program, John would have been able to fully access the educational opportunities and benefits available at USA, he would not have been forced to switch paths from a Doctor of Occupational Therapy degree to a Master's of Occupational Therapy degree, and he would not have needed to take a leave of absence.

136.    If John was able to access all of the educational opportunities and benefits available at USA on the appropriate timeline, he likely would not have crossed paths with Courtad, as he would have been pursuing a different degree with different temporal requirements.

137.    Moreover, if USA had properly addressed the rampant peer-on-peer harassment previously reported by John, he would have felt more comfortable reaching out to USA for assistance once Courtad's harassment began.

138.    Unfortunately, USA's failure to properly address the prior peer-on-peer harassment caused John not to report Courtad's harassment until after he was terminated, as he feared the situation at his clinical placement (*i.e.*, the harassment by Courtad) would get worse if he reached out to USA based on how his previous reports of harassment had been handled.

139.    Thus, USA's failure to properly address the peer-on-peer harassment raised by John led directly to (or, at a minimum, made John vulnerable to) the harassment that John suffered at

the hands of Courtad.

140.    As detailed above, John made multiple reports of Courtad's harassment to multiple individuals at USA who could have addressed Courtad's behavior and implemented corrective measures.

141.    For example, Schwier could have simply awarded John a passing grade in light of the harassment that he was forced to endure.

142.    In the alternative, John could have been afforded the opportunity to complete another clinical assignment in order to obtain his degree.

143.    Moreover, there were three separate appeals where USA officials with the ability to address the harassment identified by John and implement corrective measures in response to the harassment failed to do so.

144.    Instead, all of these USA officials blatantly and impermissibly ignored the repeated reports of harassment – both peer-on-peer and by an instructor – that John reported, resulting in John's improper dismissal from the Program.

### E. John Uncovers Additional Evidence of Discriminatory Behavior by USA Following His Dismissal

145.    Following his dismissal, John learned that a female USA student was permitted to remain in the Program even though she was terminated from a clinical assignment after she physically harmed a patient.

146.    Despite being terminated from the placement and receiving a failing performance evaluation from her clinical fieldwork educator, the female student was awarded a passing grade by Schwier without having to go through an appeal process.

147.    In John's situation, Schwier affirmatively advocated for his dismissal from the

Program based on Courtad's evaluation despite the fact that John had previously reported multiple instances of harassment – both by his peers and by Courtad – that were ignored by USA and which subjected John to further harassment.

148.    Indeed, Schwier herself was aware of John's report of harassment by Courtad before she decided to award him a failing grade.

149.    Thus, USA subjected John – a male student – to a completely different standard than the female student.

150.    As a result of these disparate outcomes crafted by Schwier, John was subjected to blatant sex discrimination by USA.

### F. John Informs USA of Additional Evidence Undermining Courtad's Credibility but USA Fails Once Again to Take Any Corrective Action

151.    After he exhausted his appeals, John learned that Courtad had colluded with a patient to fabricate the complaint that ultimately led to his termination from the clinical placement and dismissal from the Program.

152.    John provided this information, which he obtained directly from the patient's daughter, to USA.

153.    Despite actual knowledge that the basis of John's termination from the placement was fabricated by Courtad, USA failed to take any corrective measures.

154.    More disturbingly, John also learned that Courtad had previously been charged with sex offences involving a minor.

155.    John also provided this information to USA after he exhausted his appeals.

156.    Even though it now had actual knowledge of two actions that should have destroyed Courtad's credibility, USA still failed to make any corrective measures.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF TITLE IX OF THE EDUCATION**
**AMENDMENTS OF 1972 – DELIBERATE INDIFFERENCE)**

157.    John repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

158.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from
participation in, be denied the benefits of, or be subjected to discrimination under
any education program or activity receiving Federal financial assistance.

159.    Title IX of the Education Amendments of 1972 applies to an entire school or

institution if any part of that school receives federal funds.

160.    USA receives federal funding in the form of federal student loans.

161.    A university is liable for violating Title IX based on peer-to-peer or instructor-to-

student sexual harassment when (1) the school had substantial control over the harasser and the

context in which the known harassment occurred; (2) the plaintiff suffered harassment so severe

that it deprived the plaintiff of access to educational opportunities or benefits; (3) a school official

with authority to address the alleged discrimination and to institute corrective measures on the

school's behalf had actual knowledge of the harassment; (4) the school was deliberately indifferent

to the harassment such that the school's response to the harassment or lack thereof was clearly

unreasonable in light of the known circumstances; and (5) the school's deliberate indifference

subjected the plaintiff to harassment (*i.e.*, the school caused the plaintiff to undergo harassment or

made the plaintiff liable or vulnerable to harassment).

162.    The fifth element of this test may be satisfied when a plaintiff pleads that the

educational institution's deliberate indifference has subjected him to some form of sex

discrimination other than sexual harassment or sexual assault.

163.    USA exercised substantial control over John's classmates at the context in which they engaged in anti-male sexual harassment against John.

164.    The female students who harassed John were enrolled at USA and subject to discipline by USA.

165.    The female students who harassed John also did so during the course of the educational program on school grounds.

166.    As detailed above, John suffered harassment that is so severe, pervasive, and objectively offensive that it deprived him of access to the educational opportunities or benefits provided by USA.

167.    John was purposefully excluded from class discussions and group projects that formed the majority of the academic work performed during the didactic phase of the Program.

168.    John was repeatedly called "trash" by female students in the Occupational Therapy Program repeatedly.

169.    Female students in the Occupational Therapy Program also told John that he had nothing to offer the occupational therapy profession due to his status as a "Straight-White-Cis-Male."

170.    These students also told John that his presence in the Occupational Therapy Program was disrupting their "Safe Space."

171.    John was subjected to this type of anti-male harassment during each and every class that he took at USA.

172.    As a result of this known harassment, John was unable to access educational

opportunities or benefits offered by USA.

173.    As noted above, John was purposefully excluded from participating in the group projects that made up the majority of the coursework in the Occupational Therapy Program.

174.    John's ability to meet the academic requirements of the Program suffered as a result of this unabated and known harassment.

175.    John had planned on obtaining a Doctor of Occupational Therapy degree.

176.    However, his grades and ability to keep up with the demands of the doctorate program suffered as a result of the harassment he was subjected to.

177.    This led him to abandon his quest to obtain a Doctor of Occupational degree and seek a Master's of Occupational Therapy degree instead.

178.    In fact, the harassment John was ultimately forced to take a leave of absence from the Occupational Therapy Program starting on December 17, 2021 as a result of the known yet unaddressed peer harassment

179.    McIntyre and John's professors (and by extension USA) had actual knowledge of the peer-on-peer harassment John was being subjected to.

180.    McIntyre and John's professors had the authority to address the discrimination reported to them by John and to institute corrective measures on the school's behalf

181.    McIntyre and John's professors did not take any action to address the peer-on-peer harassment reported by John or institute corrective measures.

182.    The members of the Academic Appeals Committee, Hughes, and Goldstein had actual knowledge of the peer-on-peer harassment John was subjected to.

183.    The members of the Academic Appeals Committee, Hughes, and Goldstein had the

authority to address John's reports of peer-on-peer harassment and implement corrective measures.

184.    The members of the Academic Appeals Committee, Hughes, and Goldstein did not take any steps to address the peer-on-peer harassment that John identified or institute corrective measures.

185.    Thus, USA was deliberately indifferent to John's reports of peer-on-peer harassment, as it took no steps to prevent the harassment from continuing.

186.    USA's response (or lack thereof) to John's reports of peer-on-peer harassment was clearly unreasonable in light of the known circumstances.

187.    As detailed above, USA's deliberate indifference subjected John to further harassment and also made John liable or vulnerable to harassment.

188.    The affiliation agreement between the Utah facility and USA states that USA will determine the course of action if a facility deems a student is unacceptable.

189.    The affiliation agreement also notes that a facility must consult with USA before excluding any USA student from its premises.

190.    Courtad reached out to USA to ask how she should handle John's termination from the clinical rotation.

191.    USA then gave Courtad two options on how to proceed.

192.    Accordingly, USA exercised substantial control over Courtad and the context in which Courtad's harassment of John occurred.

193.    Throughout the clinical placement, Courtad consistently made demeaning and belittling statements to John because he reminded her of her ex-husband and male children that she had fostered.

194.    Courtad consistently gave John less than desirable and humiliating work assignments, including putting him in extremely uncomfortable situations that he had explicitly asked not to be put in.

195.    She also refused to provide John with proper clinical instruction and appropriate feedback on the tasks he performed.

196.    Courtad took these actions against John because he reminded her of other men/boys with whom she had bad experiences.

197.    As a result of Courtad's harassment, John was unable to access educational opportunities or benefits offered by USA's clinical rotation program.

198.    Schwier and Meyer had actual knowledge of Courtad's harassment of John.

199.    Schwier and Meyer had the authority to address John's report of harassment and implement corrective measures.

200.    Schwier and Meyer did not take any action in response to John's report of Courtad's harassment or institute corrective measures.

201.    In fact, rather than taking steps to protect John from and implement corrective measures to address the known instances of harassment by Courtad that John had reported on July 31, 2023, Schwier awarded John an "F" grade for this final clinical rotation based on false information provided by Courtad regarding non-existent interpersonal differences and fabricated patient complaints.

202.    During a meeting with Schwier and Meyer on August 3, 2023, John explained that he did not seek assistance related to Courtad's harassment prior to his July 31, 2023 written report because he believed that no one at USA would help him.

203.    This belief was based on USA's previous failure to remedy the peer-on-peer harassment that John had been subjected to during the didactic portion of the Program.

204.    Neither Schwier nor Meyer (nor anyone else at USA) took any action to address Courtad's harassment or institute corrective measures following the August 3, 2023 meeting.

205.    On August 9, 2023, USA informed John that he was being dismissed from the Program due to the failing grade awarded by Schwier.

206.    The members of the Academic Appeals Committee, Hughes, and Goldstein had actual knowledge of the harassment John was subjected to by Courtad.

207.    The members of the Academic Appeals Committee, Hughes, and Goldstein had the authority to address John's reports harassment by Courtad and implement corrective measures.

208.    The members of the Academic Appeals Committee, Hughes, and Goldstein did not take any steps to address the harassment by Courtad that John identified or institute corrective measures.

209.    Instead, the members of the Academic Appeals Committee, Hughes, and Goldstein facilitated John's dismissal from the Program.

210.    Thus, USA was deliberately indifferent to John's reports of harassment by Courtad, as it took no steps to prevent the harassment from continuing.

211.    USA's response (or lack thereof) to John's reports of harassment by Courtad was clearly unreasonable in light of the known circumstances.

212.    USA's deliberate indifference to Courtad's harassment also subjected John to sex discrimination other than sexual harassment or sexual assault.

213.    A female USA student was permitted to remain in the Program even though she

was terminated from a clinical assignment after she physically harmed a patient.

214.    Despite being terminated from the placement and receiving a failing performance evaluation from her clinical fieldwork educator, the female student was awarded a passing grade by Schwier without having to go through an appeal process that John was forced to endure.

215.    In contrast to how she handled the situation involving the female student, Schwier gave John an "F" grade and affirmatively advocated for John's dismissal from the Program.

216.    Compounding her discriminatory behavior, Schwier was also aware of John's report of harassment by Courtad before she decided to award him a failing grade and advocate for his dismissal.

217.    Thus, USA subjected John – a male student – to a completely different standard than the female student and, therefore, engaged in inappropriate sex discrimination.

218.    Moreover, even after John provided USA with evidence that Courtad was a sex offender who fabricated the patient complaint that was the root cause of his termination from the clinical placement, which completely undermined any credibility that Courtad may have had, USA steadfastly refused to take any corrective measures.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against SU as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(ii)    awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

Dated: October 3, 2025                         Respectfully submitted,
                                               **OFFIT KURMAN, P.C.**


                                               _____
                                               Deborah H. Petito, Esq.
                                               Offit Kurman, P.C.
                                               445 S. Figueroa Street, 18th Floor
                                               Los Angeles CA 90071
                                               Tel: (213) 629-5700
                                               Fax: (213) 624-9441
                                               deborah.petito@offitkurman.com

                                               */s/ Kimberly C. Lau*
                                               Kimberly C. Lau, Esq.
                                               (*pro hac vice* forthcoming)
                                               Offit Kurman, P.A.
                                               590 Madison Avenue, 6th Floor
                                               New York, New York 10022
                                               Tel: (212) 545-1900
                                               Fax: (212) 545-1656
                                               kimberly.lau@offitkurman.com

                                               */s/ James E. Figliozzi*
                                               James E. Figliozzi, Esq.
                                               (*pro hac vice* forthcoming)
                                               Offit Kurman, P.A.
                                               590 Madison Avenue, 6th Floor
                                               New York, New York 10022
                                               Tel: (212) 545-1900
                                               Fax: (212) 545-1656
                                               james.figliozzi@offitkurman.com

4924-1925-9759, v. 1