**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

---

| | |
|---|---|
| **JOHN DOE,** | Civil Action No.: **'25CV2631 H    DDL** |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM** |
| **UNIVERSITY OF ST. AUGUSTINE FOR HEALTH SCIENCES, LLC,** | |
| **Defendants.** | |

---

## PRELIMINARY STATEMENT

This is an action for violations of Title IX of the Education Amendments of 1972. For the reasons set forth below, Plaintiff respectfully requests that this Court issue an Order granting him leave to proceed in this action under a pseudonym.

## STATEMENT OF FACTS

### John Doe's Enrollment in the Defendant's Occupational Therapy Program

In July 2020, John Doe enrolled in the Occupational Therapy Program at University of St. Augustine for Health Services, LLC ("USA"). Complaint at ¶ 26. As a result of the COVID-19 pandemic, for the first two trimesters of the 2020-2021 school year USA was offering predominantly virtual coursework, which was supplemented with an additional, limited, in-person lab requirement. Complaint at ¶ 27. During the third trimester of the 2020-2021 school year, USA returned to in-person coursework, and John began attending classes full time in-person at USA. Complaint at ¶ 14. Women at USA in the Occupational Therapy Program outnumber men by an approximate ratio of 16.5 to 1. Complaint at ¶ 29.

**John is subjected to peer-on-peer sexual harassment by classmates at USA**

As part of his studies, John was assigned to a cohort at USA where he was the only male in the group. Complaint at ¶¶ 30-31. John was subjected to peer-on-peer sexual harassment by his classmates as a result of his male gender. Complaint at ¶¶ 26-37. First, the members of John's cohort, who were all women, arranged their desks in a manner that purposefully excluded John. Complaint at ¶ 32. Additionally, the members of his cohort repeatedly referred to John as "trash" and told him that he had nothing to offer the occupational therapy profession as a result of his status as a "Straight-White-Cis-Male." Complaint at ¶ 33. Further, the female students told John that his mere presence in the program was disrupting their "safe space" solely because he was a man. Complaint at ¶ 34. John's female classmates were aware of what they were doing to him and actually found it funny that they were able to treat him this way and not be subjected to any consequences. Complaint at ¶ 36. This treatment of John by his classmates was witnessed by John's professors at USA but the professors failed to take any action. Complaint at ¶ 35. This anti-male harassment was pervasive as John was subjected to it during each and every in-person that John took at USA during the third trimester of the 2020-2021 school year until December 17, 2021. Complaint at ¶ 37.

**John Reports the Harassment to USA, which USA ignores**

Erin McIntyre was John's advisor in the Occupational Therapy Program at USA. Complaint at ¶ 38. John immediately reported the instances of peer harassment to Erin McIntyre, and continued to report all of the instances of harassment at his weekly meetings with McIntyre. Complaint at ¶¶ 38-40. Since McIntyre had the authority to address the anti-male harassment that John was suffering, John asked her if he could either complete independent coursework to meet his requirements, or if he could be moved to a different class to avoid the daily harassment he was receiving from his cohort. Complaint at ¶¶ 42-43. Despite her awareness of John's constant

harassment, she rejected John's requests and instead chose to prioritize avoiding conflict within the Occupational Therapy Program. Complaint at ¶¶ 38, 44. Instead of intervening to assist John, who consistently asked for help, McIntyre did nothing but observe the abuse and treated the situation as an ongoing social experiment. Complaint at ¶¶ 44-46. McIntyre even insinuated that this was John's fault, when she asked him why he hadn't expected to experience anti-male harassment as part of attending USA's occupational therapy program, as occupational therapy tends to be a female dominated profession. Complaint at ¶ 47. McIntyre's refusal to act on John's harassment resulted in the continued daily harassment that John received at each and every one of his in-person classes, including after he made repeated reports of the harassment to McIntyre. Complaint at ¶ 48.

In addition to Erin McIntyre, John also reported these instances of anti-male harassment to at least three (3) professors at USA. Complaint at ¶ 49. Like McIntyre, despite John's reporting of the abuse and repeated pleas for assistance, the professors took no action to remedy the abuse that John was suffering. Complaint at ¶¶ 50-51. These professors denied John's same requests, of moving classes or being allowed to do independent coursework, because they worried about how John's female classmates would react if accommodations were made to stop the abuse John was suffering. Complaint at ¶ 52. This continued deliberate indifference by the USA professors resulted in further instances of anti-male harassment against John as the harassment continued even after he made his professors aware of the daily abuse. Complaint at ¶¶ 53-54.

The harassment escalated to the point where John was no longer able to access the educational opportunities and benefits offered by USA. Complaint at ¶¶ 55-63. For example, John was prevented from participating in group projects that made up the majority of the coursework in the Occupational Therapy Program. Complaint at ¶¶ 55-56. John informed McIntyre and

professors at USA that he was being prevented from participating in the group projects that were fundamental to his education, however no one at USA took any action to address the anti-male harassment that John was receiving. Complaint at ¶ 57. While John had once planned on obtaining a Doctor of Occupational Therapy degree from USA, the continued and constant harassment that he was receiving resulted in John's academic performance suffering. Complaint at ¶¶ 59-61. Due to the harassment from his classmates and USA's indifference to his treatment, John ultimately was forced to abandon his quest to obtain a Doctor of Occupational Therapy and instead seek a Master's of Occupational Therapy Degree. Complaint at ¶ 62. However, due to the level of constant and unaddressed harassment, John was ultimately forced to put his dreams on hold and take a leave of absence from the Occupational Therapy Program on December 17, 2021. Complaint at ¶ 63.

### John's Return to USA and Further Harassment from a Clinical Fieldwork Educator

On January 9, 2023, John returned to USA from his leave of absence. Complaint at ¶ 64. Despite the anti-male harassment that necessitated his leave of absence, and despite John's repeated reporting of the anti-male harassment to USA officials, USA took no action upon John's return to ensure that the anti-male harassment did not continue. Complaint at ¶ 65. Without any action taken by USA, the anti-male sexual harassment restarted once John returned to USA. Complaint at ¶ 66. In the Occupational Therapy Program, there was a didactic classroom portion and a clinical placement portion. Complaint at ¶ 67. John had already completed the classroom portion, although with lower grades to the unaddressed harassment that he was subjected to, and needed to complete the clinical aspect of the program in order to graduate. Complaint at ¶¶ 68-69. This clinical program was split into two separate clinical placements. Complaint at ¶¶ 70-71. John was able to successfully complete his first clinical placement at a side in Modesto, California, and

therefore only needed to complete the final clinical placement in order to complete his degree requirements. Complaint at ¶¶ 70-71.

In March 2023, Jaynee Taguchi Meyer, USA's Academic Fieldwork Coordinator, without notice, changed John's final clinical placement over an objection from John from a clinical site in Phoenix, Arizona, to a facility in Cedar City, Utah, which he would participate in for twelve (12) weeks. Complaint at ¶¶ 72, 80. John's clinical fieldwork educator at the clinical site in Utah was Jennifer Courtad, who also went by Jennifer Timmons. Complaint at ¶ 73. Throughout his placement at the Utah clinical site, Courtad consistently made inappropriate, belittling, and demeaning statements to John based his status as a male. Complaint at ¶¶ 74-75. For example, Courtad would make negative comments that John reminded her of her ex-husband, and at other times commented that John reminded her of prior male children that she fostered. Complaint at ¶ 74-75. Courtad's negative view of John, based on prior bad experiences with men, resulted in Courtad harassing John by repeatedly giving John less desirable and humiliating work assignments, such as putting him in very uncomfortable situations that he explicitly asked not to be put in. Complaint at ¶¶ 76-77. Courtad's anti-male bias pervaded John's clinical experience, as she constantly refused to provide John with proper clinical instructions, refused to provide feedback on tasks John did perform, and repeatedly made unkind comparisons between John and her ex-husband/prior male foster children. Complaint at ¶¶ 77-78. This anti-male bias and sentiment had nothing to do with any action by John, and prevented him from accessing the educational opportunities and benefits of USA's clinical rotation program. Complaint at ¶¶ 78-79.

### John's Dismissal from the Occupational Therapy Program

On July 20, 2023, during the eleventh and penultimate week of the clinical rotation, Courtad contacted Meyer via telephone and provided false information concerning John's behavior

while at the clinical rotation. Complaint at ¶¶ 80-81. Meyer responded on the phone that Courtad had two (2) options to deal with John based on the affiliation agreement between the Utah facility and USA: first, allow him to complete his program and then inform John he had failed, or to terminate John's rotation that day and time. Complaint at ¶¶ 82-86. According to the affiliation agreement between USA and the Utah facility, the determination for what to do with a student is left to USA to determine, and specifically bars the clinical facility from removing the USA student without the USA determination. Complaint at ¶¶ 84-85. The affiliation agreement also specifically notes that a facility must consult with USA before terminating a rotation or excluding any USA student from its premises. Complaint at ¶ 86. After the call, Courtad sent a follow up email to Meyer in which she made additional false claims about John's behavior during the rotation. Complaint at ¶ 87.

On July 21, 2023, John's clinical rotation was terminated. Complaint at ¶ 88. Ten (10) days later, on July 31, 2023, John submitted a written report of Courtad's harassing behavior to USA. Complaint at ¶¶ 89-90. John had not done this before as his experience continually reporting the peer-on-peer harassment to USA, and their indifference, dissuaded him reporting the harassment at the hands of Courtad. Complaint at ¶ 91. Had USA responded properly to John's prior reporting of harassment, John would have been able to avoid the harassment by Courtad as he would have reported it to USA. Complaint at ¶¶ 91-92. This report was received by Erin Schwier, USA's Occupational Therapy Program Director, and Meyer. Complaint at ¶ 90. Both Schwier and Meyer were the proper authorities at USA for this report, and had the authority to address the allegations of harassment made by John. Complaint at ¶ 93. However, despite this report, USA once again failed to take any action in response to John's report. Complaint at ¶ 94.

On August 2, 2023, despite John's complaint of harassment, Schwier received and accepted as true a final evaluation from Courtad containing false allegations regarding John's behavior during the clinical rotation. Complaint at ¶ 95. Instead of investigating and attempting to help a student, Schwier awarded John a "F" grade based on the false allegations by Courtad. Complaint at ¶ 95-97.

On August 3, 2023, John met with Schwier and Meyer, during which he explained that he did not previously report the harassment at the hands of Courtad because of his experience reporting the peer-on-peer harassment that John was subjected to in the previous semesters, and USA's complete failure to address John's complaints. Complaint at ¶¶ 98-99. Once again, USA failed to take any action as a result of the meeting, and finalized John's grade of a "F" based on the false information from Courtad. Complaint at ¶¶ 100-101. On August 9, 2023, USA informed John that due to the grade he was being dismissed from the program. Complaint at ¶ 102.

### John's Appeals His Dismissal

Under the guidelines laid out in USA's handbook, John appealed the dismissal from USA to the Academic Appeals Committee, which was submitted on August 31, 2023. Complaint at ¶ 103-104. In this appeal, John reiterated the anti-male sexual harassment that John suffered during the didactic and clinical portions of the Occupational Therapy Program. Complaint at ¶ 104. This included John reiterating that during the didactic phase of the Program he was referred to as "trash" by his classmates and was not allowed to participate in group work because he was a "straight-cis-white-male." Complaint at ¶ 105. John also reiterated that none of the professors who witnessed this treatment did anything to remedy or stop the harassment, and that when John escalated the reports to McIntrye and professors they did not take any action, and instead stated that he may be able to learn something from the harassment. Complaint at ¶¶ 106-107. During this appeal John

also documented again the harassment he suffered during his clinical program from Courtad, which included, but was not limited to, verbal abuse, ignoring questions from John about patient care, and requiring John to perform demeaning tasks that were outside the scope of his education. Complaint at ¶ 109. Finally, John also documented that his final grade from Courtad was based on her anti-male bias, that Courtad had fabricated the supposed issues that led to John's dismissal, and that this harassment deprived John of educational opportunities. Complaint at ¶¶ 110-111. While the Academic Appeals Committee had the authority to address John's reports of harassment, they took no action to address the harassment, and instead issued a denial of John's appeal and affirmed his dismissal on September 9, 2023. Complaint at ¶¶ 112-114.

On September 11, 2023, John submitted his second appeal to Tia Hughes, the Associate Dean of USA's college of Rehabilitative Services for Occupational Therapy. Complaint at ¶ 115. In this appeal, John informed Hughes of the following:

- his exclusion from class discussions and group work by his female classmates on the basis of his gender;

- that female classmates referred to John as "trash" several times during class because of his gender; that John asked professors numerous times for help, which they declined;

- that John asked USA professors and McIntyre to change his classes, or allow independent work to stop the harassment, which was declined;

- that John repeatedly and desperately reached out to professors and McIntyre to help, which was declined;

- that when John reached out to McIntyre her response was to question why he did not expect such treatment as occupational therapy was a female dominated occupation, and despite her acknowledgement that John was being singled out and segregated due to his sex, she chose to not do anything to help; and

- that John was harassed by Courtad and did not report it due to the lack of response from USA to his initial complaints and feared that his treatment would get worse if he informed USA.

Complaint at ¶¶ 116-124. Hughes had the authority to address John's reports and institute corrective measures but instead denied John's second appeal and affirmed his dismissal from the Program. Complaint at ¶¶ 125-127.

On September 27, 2023, John submitted his third and final appeal to Brian Goldstein, the president and Chief Academic Officer of USA. Complaint at ¶ 128. This final appeal included the prior two (2) appeal letters, incorporated them by reference, and requested that Goldstein take them into consideration in his deliberations Complaint at ¶ 129. As with all other members of USA, Goldstein decided not to take action to rectify the harassment that John had suffered, and on October 4, 2023, he issued a final decision upholding John's dismissal denying the appeal. Complaint at ¶¶ 130-133.

### Additional Evidence of Discriminatory Behavior by USA is Uncovered

After John was dismissed from the Program due to his failing grade, he learned of additional information that confirmed USA's anti-male bias. Complaint at ¶¶ 145-149. John learned that a female student was permitted to remain in the Program despite the fact that she had her clinical assignment terminated due to physically harming a patient. Complaint at ¶ 145. This female student received a failing performance evaluation from her clinical fieldwork educator, yet she was awarded a passing grade by Schwier without going through any appeals process. Complaint at ¶ 146. The handling of the two situations is in stark contrast to one another, as, in John's situation, Schwier affirmatively advocated for John's dismissal from the program, and ignored John's constant reporting of anti-male harassment, which included John's complaints against Courtad that resulted in his negative evaluation. Complaint at ¶ 147. The situation is made more maddening by the fact that Schwier was aware of John's report of harassment by Courtad before she decided to award him a failing grade.  Complaint at ¶ 148.  By holding John to this

standard, USA subjected John, as a male student, to a completely different standard than the female student, which constitutes blatant sex discrimination. Complaint at ¶ 147-150.

### John Discovers Further Evidence Undermining Courtad's Credibility and USA Fails to Take Action After John Informs the University of Courtad's Malfeasance and Unseemly Criminal Past

After the appeals process was concluded, John learned that Courtad had actually colluded with a patient to fabricate the complaint that Courtad had made to USA that resulted in John's termination from the clinical placement and dismissal from the program. Complaint at ¶ 151. John learned of this from the daughter of the patient, and John then relayed this information directly to USA. Complaint at ¶ 152. Since this falsified information was at the core of the complaint from Courtad, which resulted in the termination of John's clinical experience and failing grade, it was vital to USA's decision making and should have resulted in the overturning of the denial of John's appeal. However, consistent with their treatment of any information beneficial to John, USA failed to take any action when they were informed about this by John. Complaint at ¶¶ 153. Even more disturbing than her collusion with a patient to falsify information to harm John, Courtad had previously been charged with sex offenses involving a minor. Complaint at ¶ 154. This information was also relayed by John to USA. Complaint at ¶ 155. Taken together, this newfound information should have sufficiently called into question the credibility of Courtad, whose complaint was foundational to John's dismissal from the Program, and USA should have taken action to rectify the matter. However, USA failed to take any corrective action. Complaint at ¶¶ 156.

### LEGAL STANDARD

Pursuant to Rule 10(a) of the Federal Rules of Civil Procedure, a complaint "must name all the parties." F.R.C.P. 10(a). However, "many federal courts, including the Ninth Circuit, have permitted parties to proceed anonymously when special circumstances justify secrecy.'" *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000); *Doe v. Madison School*

*Dist. No. 321,* 147 F.3d 832, 833 n. 1 (9th Cir.1998), *vacated on other grounds,* 177 F.3d 789 (9th Cir.1999) (*en banc*); *Doe v. Blue Cross & Blue Shield United of Wisconsin,* 112 F.3d 869, 872 (7th Cir.1997); *James,* 6 F.3d at 239; *Doe v. INS,* 867 F.2d 285, 286 n. 1 (6th Cir.1989) ("*Doe I*"); *Stegall,* 653 F.2d at 186; *Moe v. Dinkins,* 533 F.Supp. 623, 627 (S.D.N.Y.1981), *aff'd,* 669 F.2d 67 (2d Cir.1982).

In the Ninth Circuit, Courts have permitted parties to proceed under a pseudonym in cases where nondisclosure of the party's identity "is necessary to protect a person from harassment, injury, ridicule or personal embarrassment." *Advanced Textile Corp.*, 214 F.3d at 1067-68 (9th Cir. 2000)(*quoting United States v. Doe,* 655 F.2d 920, 922 n. 1 [9th Cir.1981]).

In *Advanced Textile*, the Ninth Circuit Court of Appeals considered for the first time an appeal from a district court order denying a plaintiff's motion to proceed under a pseudonym. The Ninth Circuit joined the other four Federal Circuits that had opined on the issue, and held that in the Ninth Circuit, a party may proceed under a pseudonym when the party's need for anonymity outweighs the prejudice to the opposing party and the public's interest in knowing the party's identity. *Advanced Textile Corp.,* 214 F.3d at 1068 (9th Cir. 2000). Applying this balancing test, courts have permitted plaintiffs to proceed under a pseudonym in the following situations:

(1) When identification creates a risk of retaliatory physical or mental harm see *Stegall*, 653 F.2d at 186; *Gomez v. Buckeye Sugars*, 60 F.R.D. 106, 107 (N.D.Ohio 1973) (permitting FLSA plaintiffs to use pseudonyms to protect them from employer reprisals);

(2) when anonymity is necessary "to preserve privacy in a matter of sensitive and highly personal nature," *James*, 6 F.3d at 238; see also *Doe v. United Services Life Ins. Co.*, 123 F.R.D. 437 (S.D.N.Y.1988) (allowing plaintiff to sue insurance company anonymously to protect against identification as a homosexual); *Doe v. Deschamps*, 64 F.R.D. 652, 653 (D.Mont.1974) (permitting plaintiff in abortion suit to use pseudonym due to the personal nature of pregnancy);

(3) and when the anonymous party is "compelled to admit [his or her] intention to engage in illegal conduct, thereby risking criminal prosecution," *Stegall*, 653 F.2d at 185; see also *Doe v. Commonwealth's Attorney for City of Richmond*, 403 F.Supp. 1199 (E.D.Va.1975), judgment aff'd. by 425 U.S. 985, 96 S.Ct. 2192, 48 L.Ed.2d 810 (1976).

*Advanced Textile Corp.,* 214 F.3d at 1068 (9th Cir. 2000). The Ninth Circuit also adopted the analysis that when a district court is analyzing the motion for a pseudonym, the court must balance the need for anonymity for the plaintiff against the "general presumptions that parties' identities are public information and the risk of unfairness to the opposing party." *Id.* at 1068 (9th Cir. 2000).

The Ninth Circuit has also held that plaintiffs should be entitled to proceed anonymously in cases where there is a substantial privacy issue involved, such as a matter that is highly sensitive in which there is potential social stigmatization involved. *see Jane Roes 1-2 v. SFBSC Mgmt., LLC,* 77 F. Supp. 3d 990, 993 (N.D. Cal. 2015)(permitting plaintiffs to proceed anonymously as it was necessary to protect them from potential ridicule or potential embarrassment in a human sexuality case.) In *SFBSC Mgmt., LLC,* the Northern District of California, San Francisco Division, determined that the plaintiffs, who formerly worked as "exotic dancers", were entitled to proceed under pseudonyms as this was a matter in which there was a substantial privacy interest involved and disclosure of the plaintiffs' names could result in social stigmatization. *SFBSC Mgmt., LLC*, 77 F. Supp. 3d at 994. This Court held that this type of case fell into a category of cases about human sexuality which is an extremely sensitive and highly personal area in which parties are often allowed to use pseudonyms. *Id.*

The Ninth Circuit went beyond the other four circuits and further held that in cases where parties are seeking to use a pseudonym to shield said party from retaliation, the district court should determine the need for anonymity by evaluating the following factors: (1) the severity of the threatened harm; (2) the reasonableness of the party's fears of retaliation; and (3) the party's

vulnerability to such retaliation should their identity be disclosed. *Advanced Textile Corp*., 214 F.3d 1058 at 1068. When analyzing the threatened harm, plaintiffs are not required to prove that the defendants themselves intended to carry out the threatened retaliation but rather that the plaintiffs were threatened and that a reasonable person would believe the threat would be carried out. *Advanced Textile Corp*., 214 F.3d 1058 at 1071. The Ninth Circuit has previously recognized that a plaintiff suing a school is a vulnerable party that can be exposed to potential retaliation, thereby justifying the anonymity of the plaintiff. *See Doe v. Madison School Dist. No. 321*, 147 F.3d 832, 833-34 n.1 (9th Cir. 1998), *vacated on other grounds*, 177 F.3d 789 (9th Cir. 1999) (*en banc*) (allowing a plaintiff to file under a pseudonym on the grounds that the plaintiff feared retaliation from the community).

In their analysis, district courts also must analyze the prejudice to the non-anonymous party at each stage of the proceeding and determine whether there is a way to structure the litigation to mitigate any potential prejudice. The Ninth Circuit has held that there is a lessened claim of prejudice to a defendant when the defendant already has knowledge of the plaintiff's identity. *Advanced Textile Corp.*, 214 F.3d 1058 at 1069 n.11. In *SFBSC Management LLC.,* the Court found that the defendants would not suffer prejudice from the plaintiffs' anonymity because the plaintiffs' had disclosed their real names under a protective order. *SFBSC Management LLC.,* 77 F. Supp. 3d at 995.

The last step of the analysis in the district court is for the court to determine whether the public's interest would be best served by requiring that all parties in a litigation proceed under the true identities. *Advanced Textile Corp.*, 214 F.3d 1058 at 1068-69. In *SFBSC Management LLC.*, the Court held that the basic facts concerning the plaintiff's and the challenged conduct and the

law is the crucial aspect that serves the public interest, and that would not be frustrated by allowing the plaintiffs to proceed anonymously. *SFBSC Management LLC.,* 77 F. Supp. 3d at 996.

Other Circuits have also employed a similar standard and have held that the public interest is served by protecting the identifies of parties when the issues involved include matters of a private, and highly sensitive nature. *See e.g., D.M. v. Cnty, of Berks,* 929 F. Supp 390, 402 (E.D. Pa. 2013) (allowing plaintiffs to proceed anonymously where plaintiffs alleged that they were wrongly accused of child sex abuse); *Doe v. Hartford Life and Acc. Ins. Co.,* 237 F.R.D. 545, 550 (D.N.J. 2006) (allowing plaintiff to proceed under a fictitious name where disclosure of the plaintiff's bipolar disorder would risk stigmatization in his community and career); *Doe v. Evans*, 202 F.R.D. 15 173, 175-176 (E.D. Pa. 2001) (allowing plaintiff to proceed pseudonymously in case alleging sexual assault by former state trooper); *Roe v. Borup,* 500 F. Supp. 127, 130 (E.D. Wis. 1980) (allowing use of fictitious name in case alleging false allegations of child sex abuse).

Finally, since *Advanced Textile Corp.,* the Ninth Circuit has recognized and accepted the use of pseudonyms in cases involving allegations of sexual misconduct in the California Universities. *See e.g.*, *Doe v. University*, 23 F.4th 930 (9th Cir. 2022); *Doe v. The University*, 891 F.3d 1147 (9th Cir. 2018); *Doe v. Allee*, 30 C.A.5th 1036 (2019); *Doe v. The Regents*, 28 C.A.5th 44 (2018); *Doe v. Claremont McKenna*, 25 C.A.5th 1055 (2018); *Doe v. University of Univ. Of Cal.*, No. 8:21-cv-01807-JVS (DFMx), 2022 WL 2132684 (C.D. Cal. Apr. 26 2022); *Doe v. White*, 440 F.Supp. 1074 (N.D. Cal. 2020).

## <u>ARGUMENT</u>

### I.    **This Litigation Involves Highly Sensitive and Personal Matters**

John asserts that the second recognized situation, anonymity is necessary "to preserve privacy in a matter of sensitive and highly personal nature," applies to this matter and thus John should be entitled to proceeding anonymously in this case. As in *SFBSC Mgmt., LLC*, this matter

involves a situation where there is a substantial privacy issue involved, such that the matter is highly sensitive. The disclosure of John's name will reveal information of the utmost intimacy and result in further social stigmatization, which is the very basis for the underlying litigation in this case. As plead in his verified complaint, and again throughout this memorandum, the basis underlying the alleged Title IX violations is that while John was a student at USA seeking a degree from the Occupational Therapy Program he was subjected to significant social stigmatization and ostracization by his peers as a result of his status as a male, which was ignored and reaffirmed by USA officials. *See* Complaint at ¶¶ 31-37. This conduct was reported multiple times to professors and members of the administration at USA, and they subjected John to further harassment and stigmatization by ignoring his claims, while denied John access to education opportunities and benefits to the point where he was forced to abandon his planned course of study and take a leave of absence from the Program. Complaint at ¶¶ 26-63. John was further ostracized and subjected to stigma during his clinical rotation when his clinical fieldwork educator expressed a significant anti-male bias towards all men, which she channeled against John, which ultimately resulted in her colluding to have John dismissed from the Occupational Therapy Program. Complaint at ¶¶ 64-102, 151-56. All of this harassment occurred to John because he entered a program where men were the vast minority of students (a 16.5 to 1 ration in the USA Occupational Therapy Program) and USA officials chose to continually ignore, and subject, John to further harassment due to his status as a male. Complaint at ¶ 29.  USA also failed to remedy the years' long harassment campaign through multiple levels of appeals, and ignored the evidence uncovered by John after the appeals process ended that indicated he was subjected to discriminatory treatment.  Complaint at ¶¶ 103-56.

The Ninth Circuit has stated previously that plaintiffs should be entitled to proceed anonymously in cases where there is a substantial privacy issue involved, which includes situations where there is potential social stigmatization. *SFBSC Mgmt., LLC.*, 77 F. Supp. 3d at 993. This is especially the case in cases of human sexuality, which is an extremely sensitive and highly personal area where courts in this Circuit often allow plaintiffs to proceed anonymously. *Id.* As noted above, the Ninth Circuit has recognized and accepted the use of pseudonyms in cases involving allegations of sexual misconduct in the California universities. *See e.g.*, *Doe v. University*, 23 F.4th 930 (9th Cir. 2022); *Doe v. The University*, 891 F.3d 1147 (9th Cir. 2018); *Doe v. Allee*, 30 C.A.5th 1036 (2019); *Doe v. The Regents*, 28 C.A.5th 44 (2018); *Doe v. Claremont McKenna*, 25 C.A.5th 1055 (2018); *Doe v. University of Univ. Of Cal.*, No. 8:21-cv-01807-JVS (DFMx), 2022 WL 2132684 (C.D. Cal. Apr. 26 2022); *Doe v. White*, 440 F.Supp. 1074 (N.D. Cal. 2020).

As applied to this case, disclosure of John's name would result in him forever being associated with sex based discrimination. Even if John were to prevail, the damage would be done and for the rest of his life John would never be able to escape the stigma of being subjected to harassment and abuse on the basis of his gender. There is no doubt that there is still a social stigma surrounding men making claims that they were discriminated against for being a male, and if John's name were to be made public he would forever carry that stigma with him. Keeping John's name confidential in this litigation is also consistent with Federal Policy under the Family Educational Rights and Privacy Act, as this case involves school disciplinary records. The confidentiality of school disciplinary records has already been well established. *See United States v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002). Even if John ultimately prevails in this action after disclosing his name, the stigma associated with these allegations is so substantial that schools, employers, and John's community would judge john based on his allegations and would forever

associate the facts of his allegations with him. All John sought was to attend USA, obtain a degree in Occupational Therapy, and make a career helping people. Making public his name, and associating it with this litigation, would carry a stigma with him in the community that would forever tarnish his future career.

## II.    Identification Poses A Risk Of Harm To John Doe and Potential Retaliation

Absent the use of a pseudonym, Plaintiff will be deterred from prosecuting this case if the price he must pay is the disclosure of his identity. The chilling effect may also deter other individuals who have been harassed and discriminated against by their colleges or universities. Courts have determined that there is a substantial public interest in ensuring cases involving important issues are adjudicated "without the risk of stigmatization." *Hartford Life and Acc. Ins. Co.,* 237 F.R.D. at 550. Revealing John Doe's identity would result in significant harm, namely, the exact damages he seeks to remedy in this matter – further reputational damages, economic injuries, and the loss of educational and career opportunities. Complaint at ¶¶ 134-139; *see Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *9 ("Should Plaintiff prevail in providing that the charges against him were unfounded . . . forcing Plaintiff to reveal his identity would further exacerbate the emotional and reputational injuries he alleges.") Therefore, forcing Plaintiff to reveal his identity would not further any aspect of the litigation and "instead poses a risk that Plaintiff would be subject to unnecessary ridicule and attention." *Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *9.

Further, the Ninth Circuit has held that social stigmatization is sufficient to warrant proceeding anonymously as it is necessary to protect the plaintiff from potential ridicule or embarrassment, and protection of the type requested herein is at the forefront in a human sexuality case. *SFBSC Mgmt., LLC.,* 77 F. Supp. 3d at 993; *Doe v. Rostker*, 89 F.R.D. 158, 162 (N.D. Cal. 1981); *Advanced Textile Corp.,* 214 F.3d 1058 at 1067-68. As applied, even if John Doe proceeds

with and prevails in this matter, the disclosure of his name, as a male who was the victim of sex based discrimination, would result in such a significant social stigma that would hinder his ability to pursue future career and licensing endeavors, including to obtain internships and to gain employment in the field of occupational therapy. This is especially the case in a field that is dominated by women, as the majority of John's potential future colleagues, supervisors, and hiring employers will be female. Moreover, any future university or employer would undoubtedly have access to the records related to this matter and would discover that Plaintiff made allegations of harassment as a result of his sex. In the context of Plaintiff's future career working in a field that is already shown to be hostile to males, it would undoubtedly ostracize plaintiff from his future potential colleagues and endanger his ability to obtain employment in his chosen field. Indeed, men making their own claims of sexual harassment and discrimination carries an additional stigma, as men are often belittled when making claims of sexual discrimination. Based on the foregoing, John Doe should be permitted to proceed anonymously as requiring him to reveal his identity would result in significant harm.

The nature of the Internet today is such that any plaintiff's identity is readily accessible via a simple online search. Thus, courts must be willing to afford additional protective measures to avoid further damage to a plaintiff involved in a matter concerning allegations such as those underlying the instant matter. Further, there is no doubt that "cases stemming from investigations of sexual abuse on college and university campuses have garnered significant media attention, posing the risk of further reputational harm to both the plaintiffs in these cases and their accusers." *See Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *6; *see also Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 180 (D.R.I. 2016) ("This case concerns an issue that has been the subject of

increasing attention and controversy, particularly in academia, and which has garnered much recent media and scholarly commentary.")

For all of the reasons set forth above, identification poses a risk of serious harm to John Doe. As a result, he should be provided the anonymity of a pseudonym.

### III.    John Faces A Risk of Potential Retaliation Should His Name be Made Public

John Should also be allowed to proceed anonymously as it would shield him from retaliation. The Ninth Circuit has gone beyond the other Federal Circuits when it recognized the need to shield certain parties from retaliation in highly sensitive cases. *Advanced Textile Corp*., 214 F.3d 1058 at 1071; *Madison School Dist. No. 321,* 147 F.3d at 833-834 n.1. When evaluating whether a party should proceed anonymously, courts have looked to the following three factors: (1) the severity of the threatened harm; (2) the reasonableness of the party's fears of retaliation; and (3) the party's vulnerability to such retaliation should their identity be disclosed. *Advanced Textile Corp*., 214 F.3d 1058 at 1071. It is not necessary that it be the defendants themselves threatening harm to the plaintiff. *Id.*

As applied to this case, John meets all three factors, thereby warranting anonymity in order to protect John from potential retaliation. First, as discussed in the Complaint and throughout this memorandum, John was subjected to abuse and harassment by his peers while a student at USA. Complaint at ¶¶ 32-37. Further, due to USA's anti-male bias and their continual dismissal of his complaints, John feared that his treatment at times would become worse if he reached out to USA and asked for help since they had shown a pattern of ignoring his requests for help, and even questioning why John did not expect this treatment. Complaint at ¶ 124. Therefore, John fears that should his name be made public in the community, his peers that already demonstrated a significant anti-male bias, and demeaned John, would seize on this and further belittle and target John for abuse. The Ninth Circuit has previously allowed plaintiffs to proceed anonymously in this exact

situation, where they fear retaliation from the community when challenging a school. *See generally Madison School Dist. No. 321*, 147 F.3d 832, 833-34 n.1 (9th Cir. 1998), *vacated on other grounds*, 177 F.3d 789 (9th Cir. 1999) (*en banc*). Second, based on the previous harassment and abuse John was subjected to, any reasonable person would fear retaliation in this situation. Finally, as discussed throughout, John is vulnerable to additional retaliation as in the modern world it is foreseeable that John's former classmates will find out about this litigation and use that information to make online attacks and ridicule John further, something that they have already shown a propensity for. Based on the above, John should be entitled to proceed anonymously to shield him from potential retaliation.

## IV. Defendants Will Not Be Prejudiced If Plaintiff Is Permitted To Use A Pseudonym

John should also be permitted to proceed anonymously, as Defendants will not be prejudiced in any way. Significantly, because Defendant is already aware of John's true identity, they will not be prejudiced if he is afforded the protection of a pseudonym. *SFBSC Management LLC.,* 77 F. Supp. 3d at 995. As in *SFBSC Mgmt., LLC,* the defendant is aware of John Doe's true identity, and therefore there is a lessened claim of prejudice. There is no doubt that Defendant will have an unobstructed opportunity to conduct discovery, present its defenses, and litigate this matter, regardless of whether Plaintiff identifies himself or proceeds anonymously. Accordingly, John Doe must be permitted to proceed anonymously in this action as revealing his name will cause significant prejudice to him, while proceeding anonymously will not hinder Defendants in any way.

## V. There Is Minimal Public Interest in Plaintiff's Identity

There is simply nothing about John Doe that would heighten any public interest beyond the normal public interest in any judicial proceedings sufficient to outweigh his right to privacy.

There is minimal public interest in disclosing John's name when weighed against his interest in proceeding anonymously.  John is not a public figure or otherwise noteworthy individual, and there is no basis for putting his sensitive and private personal matters on public display.  Further, allowing John to use a pseudonym will not be detrimental to the general public's understanding of this matter (to the extent that there is any public interest in this matter).  The public's knowledge will only be restricted as to his identity, but not to the substantive allegations in this matter.  Moreover, forcing John Doe to reveal his identity could have a chilling effect on other similarly situated future plaintiffs.  The factors at issue in this case, therefore, favor anonymity for John Doe.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order granting Plaintiff leave to proceed under a pseudonym and granting him such additional relief as the Court may deem just and proper.

Dated: October 3, 2025

Respectfully submitted,
**OFFIT KURMAN, P.C.**

_____
Deborah H. Petito, Esq.
Offit Kurman, P.C.
445 S. Figueroa Street, 18th Floor
Los Angeles CA 90071
Tel: (213) 629-5700
Fax: (213) 624-9441
deborah.petito@offitkurman.com

_/s/ Kimberly C. Lau_
Kimberly C. Lau, Esq.
(_pro hac vice_ forthcoming)
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, New York 10022
Tel: (212) 545-1900

Fax: (212) 545-1656
kimberly.lau@offitkurman.com

_/s/ James E. Figliozzi_____
James E. Figliozzi, Esq.
(*pro hac vice* forthcoming)
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, New York 10022
Tel: (212) 545-1900
Fax: (212) 545-1656
james.figliozzi@offitkurman.com

4931-0581-4639, v. 1